# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| ADAN ORTIZ,<br><br>   Plaintiff,<br><br>   v.<br><br>RANDSTAD INHOUSE SERVICES, LLC, *et al.*,<br><br>   Defendants. | ED CV 22-01399 TJH (SHKx)<br><br><br>Order<br>[19] |

   The Court has considered the motion to compel arbitration [dkt. # 19] filed by Defendants Randstad Inhouse Services, LLC and Randstad North America, Inc. [collectively, "Randstad"], together with the moving, opposing and supplemental papers.

   The following facts are not in dispute for this motion.

   Randstad is a staffing agency that provides workers to, *inter alia*, Defendants XPO Logistics, Inc., XPO Logistics, LLC, and/or XPO Logistics Supply Chain, Inc. [collectively, "XPO"]. In September, 2021, XPO was renamed GXO, but continues to be referred to, here, as XPO.

   From August, 2020, to February, 2021, Plaintiff Adan Ortiz was employed by

Randstad and assigned to work at an XPO warehouse in San Bernardino County that received, stored, and processed Adidas shoes, watches, and apparel. Specifically, the warehouse received merchandise – at least some of it from abroad – and, then, distributed it to domestic consumers and retailers in California and other states. Ortiz's job duties included, *inter alia*, transporting packages of merchandise after they arrived at the warehouse and preparing packages of merchandise to leave the warehouse.

During Randstad's onboarding process, Ortiz signed an Agreement to Arbitrate, which required the arbitration of any claims concerning his "recruitment, hire, employment, client assignments and/or termination including, but not limited to, those concerning wages or compensation." The Agreement to Arbitrate, also, included a waiver of class action claims; a provision that any Randstad client to which Ortiz provided services was an intended beneficiary; and a provision that the Agreement to Arbitrate was governed by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* ["the FAA"].

On October 25, 2021, Ortiz applied, again, to work for Randstad and signed another, largely identical, Agreement to Arbitrate. Randstad rehired Ortiz on October 26, 2021, and, then, terminated him on November 2, 2021. The record is not clear as to whether Ortiz was assigned to work for XPO during that second employment period.

On March 1, 2022, Ortiz filed this putative class action in the Los Angeles County Superior Court against Randstad and XPO, alleging various California wage and hour claims; a claim under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and a claim under the Private Attorney General Act, Cal. Lab. Code §§ 2689, *et seq.*

Ortiz's Complaint proposed four subclasses: (1) All persons employed by Randstad and XPO and/or any staffing agency and/or any other third parties in hourly or non-exempt positions in California, from four years prior to the filing of this case until judgment is entered; (2) All persons employed by Randstad and XPO in California, from one year prior to the filing of this case until judgment is entered; (3)

Those members of subclass 1 who were employed by Randstad and XPO in California; and (4) All persons employed by Randstad and XPO in California, from four years prior to the filing of this case until judgment is entered.

On August 8, 2023, Randstad removed pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(c),(d)(2). On August 25, 2022, this case was transferred to this Court as a related case to *Emerita Corado-Cortez v. XPO Logistics, Inc.*, CV 19-00670 TJH (SHK), a wage and hour class action that was settled in 2021.

Randstad, now, moves to compel arbitration. XPO joined the motion.

The Court's role when deciding a motion to compel arbitration is limited to three determinations: (1) Whether there is a valid agreement to arbitrate; (2) Whether the agreement to arbitrate encompasses the dispute at issue; and (3) Whether there was a waiver of arbitration. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *Newirth by & through Newirth v. Aegis Senior Cmtys., LLC,* 931 F.3d 935, 940 (9th Cir. 2019).

Randstad has the initial burden, here, to establish the existence of an agreement to arbitrate between the parties. *See Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 n.9 (9th Cir. 2007). If Randstad meets its initial burden, the burden will, then, shift to Ortiz to establish that the agreement to arbitrate is not enforceable. *See Wynn Resorts, Ltd. v. Atl.–Pac. Capital, Inc.*, 497 F. App'x 740, 742 (9th Cir. 2012) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

The FAA grants the District Court authority to compel arbitration if there is an enforceable arbitration agreement. *In re Van Dusen*, 654 F.3d 838, 842 (9th Cir. 2011). Thus, "when confronted with an arbitration clause, the [D]istrict [C]ourt must first consider whether the agreement at issue is of the kind covered by the FAA." *In re Van Dusen*, 654 F.3d at 844. Here, Ortiz argued that the Agreement to Arbitrate is not covered by the FAA because he falls under the FAA's transportation worker exemption, 9 U.S.C. § 1, for "contracts of employment of seamen, railroad employees, or any class of workers engaged in foreign or interstate commerce."

In *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), the Ninth Circuit held that if one party to an arbitration agreement is exempt under 9 U.S.C. § 1, and the agreement is governed solely by the FAA, then that agreement is invalid. In *Rittmann*, the employee was entitled to § 1 exemption, and the employer argued that arbitration should, nevertheless, be compelled under the law of Washington state, which supplied the relevant state law, instead of the FAA. *Rittmann*, 971 F.3d at 919-20. The Circuit applied Washington contract interpretation laws to construe the agreement and concluded that the agreement was ambiguous as to whether the parties intended Washington law to apply if the FAA did not. *Rittmann*, 971 F.3d at 920. Washington law requires ambiguities to be construed against the contract's drafter – in that case, the employer. *Rittmann*, 971 F.3d at 920. Thus, the Circuit concluded that neither the FAA nor state law applied to the agreement; therefore, "[b]ecause there is no law that governs … there is no valid arbitration agreement." *Rittmann*, 971 F.3d at 920-21.

**Applicability of Federal Arbitration Act's Exemption**

Ortiz argued that he was exempt from the FAA because, while working at XPO, he was a transportation worker engaged in foreign and interstate commerce. To determine whether Ortiz was an exempt transportation worker, the Court must, first, determine the class of workers to which Ortiz belonged, and, then, determine whether that class of workers was engaged in foreign or interstate commerce. *See Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022).

To determine the relevant class of workers, the Court must consider the nature of Ortiz's work, not the nature of XPO's business. *See Southwest Airlines*, 142 S. Ct. at 1788. Ortiz declared that he worked at XPO as an Equipment Operator and that his duties included "unloading and picking up the packages and transporting them to the warehouse racks to organize them"; "transport[ing] the packages to the picking section of the warehouse"; "assisting Pickers in obtaining packages so they could be shipped out to individuals and/or stores in various states"; and "assist[ing] the Outflow

Department to prepare packages to leave the warehouse for their final destination."

While Randstad mostly did not dispute Ortiz's description of his work duties, it did dispute that he unloaded packages. Randstad relied on declarations from two XPO supervisors. The first declaration, from Yvonne Holland, a contingent workforce director at GXO Logistics Corporate Services, Inc., stated that, according to XPO's records, Ortiz was assigned to XPO as a "PIT/Equipment Operator." The second declaration, from Primitivo Estrada, a senior manager at GXO Logistics Supply Chain, Inc., stated that, at the time Ortiz worked at XPO, "the PIT/Equipment Operator [was] not responsible for unloading the products from shipping containers. Instead, a different position first interact[ed] with the products."

Because neither Ortiz, nor XPO's declarants, defined the scope of "unload" in their declarations, it is not clear whether Ortiz personally removed packages from a shipping container, or whether the parties, actually, disagree over Ortiz's duties. Regardless, the Court will proceed on the assumption that Ortiz's duties at XPO included only those activities that XPO did not dispute. Thus, the Court will not consider, here, that Ortiz might have personally loaded or unloaded shipping containers. Accordingly, the Court defines the relevant class of workers as those who engaged in the undisputed activities that Ortiz performed at XPO. *See Southwest Airlines*, 142 S. Ct. at 1789.

Next, the Court must consider whether that class of workers engaged in foreign or interstate commerce. *See Southwest Airlines*, 142 S. Ct. at 1789. To do so, the Court must determine whether the class of workers "play[ed] a direct and 'necessary role in the free flow of goods' across borders" and "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Southwest Airlines*, 142 S. Ct. at 1790 (quoting *Circuit City*, 532 U.S. at 121).

In *Southwest Airlines*, the United States Supreme Court held that airline ramp agents and supervisors were engaged in interstate commerce "when they handle[d] goods traveling in interstate and foreign commerce, either to load them for air travel

or to unload them when they arrive." *Southwest Airlines*, 142 S. Ct. at 1792. The Supreme Court did not limit the transportation worker exemption to only those workers who physically load and unload cargo. *Southwest Airlines*, 142 S. Ct. at 1789 n.1. Rather, the Supreme Court explained that the handling of interstate goods by airline ramp workers was only one particularly plain example of work within the flow of interstate commerce. *Southwest Airlines*, 142 S. Ct. at 1789, 1792.

Prior to the opinion in *Southwest Airlines*, the Ninth Circuit held that delivery drivers were engaged in interstate commerce when they made local, last mile deliveries of goods that had been shipped across state lines. *Rittmann*, 971 F.3d at 907, 915. Because those deliveries constituted a step of the interstate travel of goods – albeit the last, typically intrastate step – those delivery drivers "form[ed] a part of the channels of interstate commerce[.]" *Rittmann*, 971 F.3d at 917. However, work that is only tangentially connected to interstate commerce does not qualify for the FAA exemption. *Rittmann*, 971 F.3d at 911. Tangential activities include the intrastate sale of asphalt that is later used in the construction of an interstate highway, *Southwest Airlines* (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974)); the intrastate provision of janitorial services to a company engaged in interstate commerce, *Southwest Airlines* (citing *United States v. American Bldg. Maint. Indus.*, 422 U.S. 271 (1975); and the work of a transportation carrier's customer service representative, who, *inter alia*, "'never handle[s] any of the packages that the carrier deliver[s],*" Rittmann*, 971 F.3d at 911 (quoting *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351-52 (8th Cir. 2005)).

Here, it is not disputed that Ortiz "handle[d] goods traveling in interstate and foreign commerce." *Southwest Airlines*, 142 S. Ct. at 1789-90. Ortiz used a pallet jack to move packages that arrived at the warehouse – that someone else might have, first, removed from a shipping container – to warehouse racks for temporary storage before the packages were shipped out to consumers and retailers. Ortiz, later, moved those packages from storage to a "drop zone" as part of the process of preparing the packages to leave the warehouse. Unlike, for instance, a salesperson, janitor, or

customer service representative who has *some* relationship to interstate goods, but never, actually, handles them, Ortiz, while working at XPO, was personally involved in the movement of those goods. *See Rittmann* 971 F.3d at 911.

Accordingly, Ortiz was among a class of workers engaged in interstate commerce when he worked at XPO moving pallets of goods in the flow of interstate commerce. Consequently, the FAA exemption applies to him. *See Circuit City,* 532 U.S. at 119.

Whether the FAA's transportation worker exemption, also, applies to all of the putative class members, here, is beyond the scope of this motion. However, because the proposed putative subclasses are defined very broadly in the Complaint, it appears likely that some of the putative class members might not be entitled to that exemption.

**Effect of the Transportation Worker Exemption**

Randstad argued that the Agreement to Arbitrate is enforceable under California law, even if it is not enforceable under the FAA. Therefore, the Court will consider whether Ortiz could be compelled to arbitrate under California law. *See Rittmann*, 971 F.3d at 920.

In *Rittmann*, the Ninth Circuit, in determining whether Washington state law could be used to compel arbitration pursuant to an agreement governed by the FAA, applied two Washington contract interpretation laws: (1) Contract provisions may be severed if doing so does not rewrite the contract; and (2) Ambiguities must be construed against the drafting party. *Rittmann*, 971 F.3d at 920. The arbitration agreement presented to the Circuit was part of an independent contractor agreement. *Rittmann*, 971 F.3d at 908. That agreement contained a provision requiring arbitration of all disputes, as well as a separate section – Section 11 – that waived the right to bring class or collective actions. *Rittmann*, 971 F.3d at 908. A separate, general provision in the independent contractor agreement stated that the entire agreement was "governed by the law of the state of Washington without regard to its conflict of laws principles, *except for Section 11 of [the] Agreement, which is governed by the [FAA] and applicable federal law*." *Rittmann,* 971 F.3d at 908 (emphasis added).

After considering the independent contractor agreement, the Ninth Circuit, first, concluded that the "except for" clause could not be severed from the agreement without rewriting the agreement because the parties clearly intended to treat Section 11 differently from the agreement's other provisions. *Rittmann*, 971 F.3d at 920. The Ninth Circuit, ultimately, concluded that the agreement was ambiguous as to whether, in the event that the FAA did not apply to Section 11, the parties intended for Washington law to apply instead, like it did to the rest of the agreement. *Rittmann*. The Ninth Circuit construed the ambiguity against the employer and held that *no* law governed Section 11, thereby invalidating it. *Rittmann*.

Contrary to Randstad's argument, here, the problem is not that the Agreement to Arbitrate lacks a choice of law clause, but that the Agreement to Arbitrate *contains* a choice of law clause – one that requires the application of the FAA in a situation where the FAA is not applicable given the application of the transportation worker exemption. Thus, like in *Rittmann*, the question, now, is whether the Agreement to Arbitrate allows for the application of California law when the FAA cannot be applied.

As in *Rittmann*, the Court must begin with the appropriate state's laws of contract interpretation. In California, "[t]he principal rule of contract interpretation is to give effect to the parties' intent as expressed in the terms of the contract." *Regional Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal. App. 4th 1377, 1390 (2014). That is, the Court must use the contract's written terms to discern the intent of the parties, provided that the language is clear, explicit, and does not create an absurd result. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020) (citing *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 831 (2007). Further, the "[l]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case[.]" *Regional Steel*, 226 Cal. App. 4th at 1390.

Additionally, in California, the Court may sever unenforceable provisions of a contract, unless doing so would substantively rewrite the agreement, *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1412 (2003); and, if an employment contract's language is

ambiguous, the ambiguities must be construed against the drafting employer, *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016). Those two laws are nearly identical to the Washington laws that the Ninth Circuit applied in *Rittmann*.

Here, the choice of law provision in the Agreement to Arbitrate is composed of three sentences:

> This Agreement shall be governed by the [FAA]. Any federal, state or local laws preempted by the FAA shall not apply to this Agreement or its interpretation. I agree that this Agreement may be enforced and administered by a court of competent jurisdiction through the filing of a petition to: compel arbitration; confirm, vacate or modify an arbitration award; or otherwise pursuant to the FAA.

The first sentence is clear, explicit, and unambiguous – it provides for the application of the FAA to the entire agreement, and does not provide for the application of any other law. Similarly, the third sentence is clear, explicit, and unambiguous – it affirms either party's right to enforce the agreement, but provides for only one vehicle to do so – the FAA.

The second sentence, if construed in context, means that any law that is preempted by the FAA cannot be applied to the Agreement to Arbitrate. *See Regional Steel*, 226 Cal. App. 4th at 1390. Arguably, the second sentence could, also, be construed to mean that any law that is *not* preempted by the FAA *can* be applied, thereby allowing for the application of state law, here. Indeed, the FAA does preempt some California contract laws – specifically, those that "discriminate against" arbitration agreements – but it does not preempt all of them. *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022). However, the second sentence does not, itself, clearly state that some other state or federal law would govern if the FAA were inapplicable, nor does any other part of the agreement.

At best, there are two semantically reasonable interpretations of the second sentence – one that merely precludes the application of any preempted law, and one that

1 goes further and affirmatively allows the application of any non-preempted law. That,
2 by definition, is an ambiguity. *California Nat'l Bank v. Woodbridge Plaza LLC*, 164
3 Cal. App. 4th 137, 143-44 (2008). Because the Agreement to Arbitrate was drafted
4 by Randstad, the ambiguity must be construed against it. *See Sandquist*, 1 Cal. 5th at
5 248. Accordingly, the Court must construe the choice of law provision to mean that
6 the Agreement to Arbitrate can be governed only by the FAA, and no other laws,
7 including California laws.

8 Thus, because Ortiz is entitled to the FAA's transportation worker exemption,
9 the FAA does not apply, here, and no other law governs the Agreement to Arbitrate.
10 *See Rittmann*, 971 F.3d at 920-21. Therefore, no law confers authority on the Court
11 to compel arbitration pursuant to the Agreement to Arbitrate. *See In re Van Dusen*,
12 654 F.3d at 842. Consequently, Randstad failed to meet its initial burden to establish
13 the existence of a valid Agreement to Arbitrate. *See Sanford*, 483 F.3d at 963 n.9.

15 Accordingly,

17 𝕴𝖙 𝖎𝖘 𝕺𝖗𝖉𝖊𝖗𝖊𝖉 that the motion to compel arbitration be, and hereby is, 𝕯𝖊𝖓𝖎𝖊𝖉.

19 Date: January 18, 2023

Terry J. Hatter, Jr.
Senior United States District Judge